John T. LANGDON, Insurance Commissioner of the State of Wyoming; and Wyoming Insurance Department, Appellants (Respondents),

v.

INSURANCE SERVICES OFFICE, Appellee (Petitioner).

No. 5669.

Supreme Court of Wyoming.

Aug. 2, 1982.

Steven F. Freudenthal, Atty. Gen., Gerald Stack, Deputy Atty. Gen., Glenn E. Smith, and Kelly S. Davis (argued), Sp. Asst. Attys. Gen., for appellants.

W. Douglas Hickey and Glenn Parker (argued), of Hirst & Applegate, Cheyenne, for appellee.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

RAPER, Justice.

This appeal arises from the district court's reversal of the Wyoming Insurance Commissioner's decision to impose sanctions against the Insurance Services Office (ISO). The commissioner's action was premised upon a finding that ISO willfully withheld information which would have affected the commissioner's approval of proposed insurance rates. The ultimate issue for us to consider is whether the commissioner, in levying a civil penalty against ISO and in suspending its license to make and file rates on behalf of its member insurance companies, was acting properly within his statutory authority.

We will affirm the district court.

This case grows out of the Insurance Commissioner's four-year-old investigation of the insurance industry's practice of using territorial classifications within the state of Wyoming as a factor in calculating premiums.[1] Originally in 1978, the commissioner attempted to promulgate a rule banning the use of the territorial classifications on the

---

1. The insurance industry had divided the state into various territories with the rates changeable affected by the territory the insured resided in. However, there was no unanimity among the carriers as to which areas of the state were higher risks. According to the commissioner, "one classifer has the rural people with a higher rate than the people living in Cheyenne and Casper. Another reverses this."

theory that there was no evidence supporting the need for them within Wyoming and that their use resulted in rates which unfairly discriminated against residents of certain sections of the state.

ISO became involved in the rule-making because of its standing as a rating organization licensed in Wyoming under § 26–14–115, W.S.1977,[2] to make rate filings on behalf of its member insurance carriers. In May of 1978, an assistant commissioner visited ISO's Denver office to find out if ISO had any documentation which justified the use of territorial classifications. The assistant commissioner was told by the manager of ISO that it would be checked into and any documentation found would be made available to the commissioner. As the commissioner was later to discover, ISO had in its possession a study conducted in 1973 which it used internally as justification for its own territorial classifications.[3] Nonetheless ISO did not turn this study over to the commissioner even though it did provide three other surveys. These were given to the commissioner during an August 2, 1978

hearing on the proposed regulation. However, the Insurance Department found little support for the classifications from the surveys and pressed ahead with a rule against such classifications.

A regulation was drafted and filed with the Wyoming Secretary of State. It was then challenged in district court by the insurance industry. Following protracted litigation, the commissioner decided it would be better to withdraw the proposed regulation and proceed case by case as new rate filings were presented for his review.

After ISO made a filing to revise its rates, the Insurance Commissioner, by order dated September 28, 1979, requested "[a]dditional support for all rate change proposals by territory." The 1973 study was not turned over to the commissioner. He then rejected the filing on December 7, 1979, in part because ISO had failed to justify the use of territorial classifications in determining premiums.

On February 7, 1980, ISO filed another proposed rate revision. On February 21,

2. Section 26–14–115, W.S.1977:

"(a) *License required.*—No rating organization shall make or file rates for risks located in this state without being licensed therefor under this chapter.

"(b) *Application, etc.*—A corporation, an unincorporated association, a partnership or an individual, whether located within or outside this state, may apply to the commissioner for license as a rating organization. As to property and marine insurances the application shall be for such kinds of insurance, or subdivision or class of risk or a part or combination thereof, as are specified in the application. As to casualty and surety insurances the application shall be for such kinds of insurance or subdivisions thereof as are specified in the application. With its application the applicant shall file:

"(i) A copy of its constitution, its articles of agreement or association or its certificate of incorporation, and of its bylaws, rules and regulations governing the conduct of its business;

"(ii) A list of its members and subscribers;

"(iii) The name and address of a resident of this state upon whom notices or orders of the commissioner or process affecting the rating organization may be served; and

"(iv) A statement of its qualifications as a rating organization.

"(c) *Issuance or denial.*—If the commissioner finds that the applicant is competent, trustworthy and otherwise qualified to act as a rating organization, and that its constitution, articles of agreement or association or certificate of incorporation, and its bylaws, rules and regulations governing the conduct of its business conform to the requirements of law, he shall issue a license specifying the kinds of insurance or subdivisions thereof for which the applicant is authorized to act as a rating organization. Every such application shall be granted or denied in whole or in part by the commissioner within sixty (60) days of the date it was filed with him.

"(d) *Duration; fee.*—The license shall remain in effect for three (3) years unless sooner suspended or revoked by the commissioner. The fee for the license shall be as provided in section 26.1–78 [§ 26–4–101] (fee schedule).

"(e) *Suspension, etc.*—The license may be suspended or revoked by the commissioner, after hearing upon notice, in the event the rating organization violates any of the provisions of this chapter."

3. ISO divided Wyoming into three territories: Cheyenne and its immediate vicinity, Casper and its immediate vicinity, and the rest of the state.

1980, the commissioner again informed ISO that the data provided with the filing was insufficient and specifically required "[a]dditional support for the division of Wyoming into three territories for commercial automobile coverage." Again ISO failed to provide the commissioner with the 1973 study. And, again, the commissioner rejected the rate filing on March 21, 1980.

On June 27, 1980, the commissioner set a hearing for September 4, 1980 to consider whether to withdraw ISO's private passenger automobile manual and forms and to disapprove two private passenger automobile rate filings made by ISO in 1976. ISO was "requested" to "provide support" for its use of territorial classifications. The 1973 study was not produced at the hearing. However on September 11, 1980, during the cross-examination of an employee of ISO, the existence of the 1973 study was finally disclosed to the Insurance Commissioner.

Following the conclusion of the hearing, the commissioner on September 22, 1980, issued his decision in the matter. He found specifically that the 1973 study did not sufficiently support the territorial classifications. Since he found no other basis which justified the territorial classifications, he rejected the filings as not in conformity to the requirements appearing in § 26–14–105(a)(iv), W.S.1977.[4] In supplemental findings the commissioner also found ISO's failure to come forward with the 1973 study sooner violated § 26–14–134, W.S.1977. That section provides:

"No person shall willfully withhold information from, or knowingly give false or misleading information to the commissioner, any statistical agency designated by the commissioner, any rating organization, or any insurer, which will affect the rates or premiums chargeable under this chapter. A violation of this section shall subject the one guilty of such violation to the penalties provided in section 26.1–15 [§ 26–1–115]."

He then ordered the suspension of ISO's license to act as a rating organization for 180 days and imposed a $2,500 fine.

On October 22, 1980, ISO petitioned the district court for review of the commissioner's supplemental findings. On January 7, 1981, the commissioner sought leave to conduct another hearing in which additional evidence could be taken. The district court granted the commissioner's motion on January 14, 1981.

A hearing was held on March 5, 1981. On March 12, 1981, the commissioner reinstated his earlier decision suspending ISO's license and imposing a civil penalty.

ISO again sought review of the commissioner's decision in district court. On February 4, 1982, following full briefing and oral arguments, the district court reversed the commissioner and set aside his decision. The district court indicated in a memorandum opinion its view that § 26–14–134, supra, could not be violated where any information withheld did not affect the commissioner's decision to disapprove rate filings. We agree.

 Section 26–14–134, appearing in full supra, prohibits a person from willfully withholding "information * * * which will affect the rates or premiums chargeable under this chapter." Where a statute is clear on its face, there is no need to resort to rules of statutory construction. *Board of County Commissioners of County of Campbell v. Ridenour*, Wyo., 623 P.2d 1174 (1981). Section 26–14–134, supra, is clear on its face: the information withheld must make a difference.

 Here the commissioner found that the 1973 study had no impact on its decision to disapprove the rate filing; specifically

---

4. Section 26–14–105(a)(iv), W.S.1977 provides:
"(a) All rates as to casualty and surety insurance shall be made in accordance with the following provisions:

\* \* \* \* \* \*

"(iv) Rates shall not be excessive, inadequate or unfairly discriminatory."

the study did not justify the use of territorial classifications. The commissioner cannot have it both ways. If the study was of no merit and did not support the classifications, then ISO cannot be penalized for not bringing forward a useless study sooner.

The commissioner contends that had he had the study sooner he would have altered the approach he took in tackling the territorial classifications. However, that is of no import under the statute. The information withheld must have an effect on the chargeable rates of premiums. Therefore, § 26–14–134, supra, was not violated, and we must affirm the district court.

Affirmed.